**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**GREENVILLE DIVISION**

**SOUTH DELTA PLANNING &**
**DEVELOPMENT DISTRICT**                                    **PLAINTIFF**

**v.**                          **CIVIL ACTION NO.:**  4:25-cv-197-DMB-RP

**UNITED STATES OF AMERICA**                               **DEFENDANT**

### COMPLAINT

1.      SOUTH DELTA PLANNING & DEVELOPMENT DISTRICT (hereinafter "South Delta") brings this action against the United States pursuant to 26 U.S.C. § 7422, for a refund of internal revenue taxes totaling $1,384,021.47 (plus interest) or such amount as may be owed – and wrongfully denied by the Internal Revenue Service ("IRS") – as Employee Retention Credits ("ERC")[1].

2.      Additionally, and/or alternatively, South Delta seeks a declaratory judgment that it is entitled to keep the ERC previously paid to it by the IRS for Q2 and Q3 2020 and Q1 and Q2 2021.

3.      Under the Coronavirus Aid, Relief, and Economic Security Act, PL 116-136, March 27, 2020, 134 Stat 281 ("CARES Act") and subsequent amendments codified at  26 U.S.C. § 3134, South Delta is entitled to ERC refunds for the tax periods ending June 30, 2020 ("Q2-2020"), September 30, 2020 ("Q3-2020"), March 31, 2021 ("Q1-2021"), June 30, 2021 ("Q2-2021"), and September 30, 2021 ("Q3-2021") because it experienced at least a partial suspension of its operations due to governmental orders limiting commerce, travel, or group meetings due to COVID–19.

---

[1]      Employee Retention Credits or ERC or Employee Retention Tax Credits or ERTC all refer to the same thing.

1

**NATURE OF ACTION**

4.        South Delta files this civil action under 26 U.S.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney fees), authorized to be paid to South Delta under 26 U.S.C. § 3134, but wrongfully denied by the IRS.

5.        This Complaint is proper under 28 U.S.C. § 2401 and under I.R.C. §§ 6532 and 7422, as South Delta's ERC claims were duly filed more than 6 months prior to the filing of this Complaint.[2]

**PARTIES**

6.        South Delta is a private, nonprofit corporation with 501(c)(3) status from the IRS.[3] South Delta's principal place of business is in Greenville, Mississippi.

7.        South Delta was formed for the purpose of civic improvement and the economic development of six counties - Bolivar, Humphreys, Issaquena, Sharkey, Sunflower, and Washington - in the State of Mississippi.

8.        The Defendant is the United States of America.

**JURISDICTION AND VENUE**

9.        Jurisdiction in this Court is proper under 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), and under 26 U.S.C. (I.R.C.) § 7422.

10.        This Complaint is timely under 28 U.S.C. § 2401(a) and under I.R.C. §§ 6532(a)(1) and 7422(a) because South Delta duly filed claims for its ERC refunds with the Secretary more than six months prior to the date of filing this Complaint, and it has been less than two years since

---

[2]        See, Exhibit "1" South Delta's 941-Xs for Q2-2020 & Q3-2020 and Q1-2021, Q2-2021, & Q3-2021, and the Form 2848 Power of Attorney that was attached to each 941-X.
[3]        See, Exhibit "2" South Delta's 501(c)(3) status from the IRS.

2

South Delta's ERC was first disallowed on December 11, 2023.[4]

11.     South Delta has paid the payroll tax liability for one employee for each quarter, that the IRS has disallowed, Q2-2020, Q3-2020, Q1-2021, and Q2-2021, such that this Court has jurisdiction over this suit.[5]

### THE EMPLOYEE RETENTION CREDIT

12.     Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies.[6]

13.     Those orders formed a nexus of federal, state, and local government restrictions that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings to combat the spread of COVID-19.[7]

14.     The governmental response to that public health emergency involved historically unprecedented measures, including isolation orders, social distancing directives, and business modifications.

15.     The economic effects of those policies were profound. Deemed the "greatest threat to prosperity and well-being the US has encountered since the Great Depression[,]" the estimated

---

[4]     See, Exhibit "3", December 11, 2023, Disallowance letters.
[5]     See, Exhibit "4", EFTPS Payment Confirmation.
[6]     https://www.cdc.gov/museum/timeline/covid19.html (last visited 11/12/2025); see also Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 FR 15337 (March 13, 2020)(last visited 11/12/25).
[7]     See, HealthData.gov, "COVID-19 State and County Policy Orders," at https://healthdata.gov/dataset/COVID-19-State-and-County-Policy-Orders/gyqz-9u7n/data (listing 4,218 orders at the state and local level related to COVID-19)(last visited 11/12/25).

cumulative financial costs of COVID-19 were forecast at $16 trillion.[8] Over one million people died from COVID-19 in the United States alone.[9] People of color were especially hard hit.[10]

16.    In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, passed in March 2020.

17.    Section 2301 of the CARES Act created the ERC.[11]

18.    The CARES Act received overwhelming bipartisan support.[12]

19.    On Friday, March 27, 2020, President Trump signed into law the CARES Act, an over $2 trillion economic stimulus package, the largest economic stimulus bill passed in U.S. history.[13]

20.    According to information released by the U.S. Treasury, the department to which the IRS belongs, on April 10, 2020, the ERC "is a broad-based, fully refundable tax credit designed to encourage employers to keep employees on their payroll during these challenging times."[14]

21.    Congress designed the CARES Act to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the

---

[8]    Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion, The HARVARD GAZETTE, Nov. 10, 2020*. https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16-trillion .

[9]    https://www.cdc.gov/covid/php/surveillance/index.html (last visited 10/21/25).

[10]    https://www.cdc.gov/covid/php/surveillance/index.html (last visited 10/21/25).

[11]    Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, §2301, 134 Stat 281 (March 27, 2020).

[12]    It passed 419–6 and 96–0 and was signed into law on March 27, 2020.  See Harris Cnty., Texas v. Kennedy, 786 F. Supp. 3d 194, 202, fn.1 (D.D.C. 2025). See also, e.g., 166 Cong. Rec. E347 (2020) (Rep. Adams explaining that she supported the CARES Act "because it provides billions in assistance to our number one job creators, our small businesses, as they look to make payroll and keep their workers employed"); 166 Cong. Rec. E343 (2020) (Rep. Crist, voicing his support of the CARES Act, because it "provides over $350 billion for small businesses on Main Street in grants, forgivable loans, and tax credits so they can make payroll and pay monthly bills to keep their businesses afloat").

[13]    https://www.npr.org/2020/03/27/822062909/house-aims-to-send-2-trillion-rescue-

unprecedented challenges posed by the pandemic. Congress intended for the credit to be broadly applicable to help companies survive a historic pandemic that disrupted the global economy.[15]

22. The CARES Act was amended and expanded by the Relief Act.[16] The amendments: (1) extended the ERC to two additional quarters, Q1 and Q2 of 2021, so business could apply to wages paid from December 31, 2020, through June 30, 2021; (2) increased the credit amount from 50% to 70% of qualified wages; (3) increased the wage cap from $10,000 per employee per year to $10,000 per employee per quarter—i.e., increased the value of the credit from up to $5,000 per employee to up to (at the time) $19,000 per employee; (4) broadened eligibility by allowing employers to claim both PPP and ERC economic stimulus instead of requiring small businesses to only be allowed to claim one or the other; and (5) made the credit available to exponentially more small businesses by increasing the full-time employee (FTE) criteria threshold fivefold from 100 to 500 FTEs for 2021 claims.[17]

23. The next amendment came in March 2021 through the "American Rescue Plan Act of 2021," which again expanded the ERC under the (appropriately named) heading "Extension of Employee Retention Credit".[18] This amendment expanded the number of quarters for which an

---

[footnotes]

package-to-president-to-stem-coronavirus-cr , https://www.cnbc.com/2020/03/27/house-passes-2-trillion-coronavirus-stimulus-bill-sends-it-to-trump.html.

[14]  https://home.treasury.gov/system/files/136/Employee-Retention-Tax-Credit.pdf (last visited 11/12/25).

[15]  "This bill is not only a rescue package; **it is a commitment**, a commitment that your government and the people whom you elected to serve will do everything we can to limit the harm and hardship you face, both now and in the foreseeable future. **To the American public, if you do your part, I promise we will do ours**." 166 Cong. Rec. H1732-01, 166 Cong. Rec. H1732-01, H1846 (emphasis added).

[16]  See, Pub. L. 116-260, 134 Stat. 3061-3065, https://www.congress.gov/116/plaws/publ260/PLAW-116publ260.pdf (last visited at 10/18/25).

[17]  Id.

[18]  See, Pub. L. 117–2, § 9651, 135 Stat. 4, 176- 182, 176 (Mar. 2021) https://www.congress.gov/117/plaws/publ2/PLAW-117publ2.pdf (last visited 10/18/25).

eligible business could claim ERC credits and, once again, added to the types of companies eligible for the credit.[19]

24.     It was not until the "Infrastructure Investments and Jobs Act" in November 2021 that Congress first restricted the ERC in any way. [20] Even then, Congress only "clawed back" one previously available quarter, Q4 2021, for most businesses.[21]

25.     "Highly summarized," in its final form, the ERC statute allows "[e]mployers who satisfy the eligibility requirements [to] complete an amended quarterly payroll tax return to calculate and apply the tax credit, or offset, against the employer's share of certain payroll taxes."[22]

26.     "If the tax credit exceeds the amount of the employer's share of the payroll taxes owed for a given quarter, the excess (overpayment) is refunded, or paid, to the employer."[23]

27.     Under 26 U.S.C. 3134(b)(3), excess credits are treated as an overpayment refundable under Sections 6402(a) and 6413(b) of the Internal Revenue Code.

28.     The credit is available to eligible employers for the last three quarters of 2020 (Q2, Q3, and Q4-2020) and for the first three quarters of 2021 (Q1, Q2, and Q3-2021).

29.     Section 501(c)(3) corporations are specifically designated as an "eligible employer" for the purposes of the ERC under 26 U.S.C. §3134 (c)(2)(C).

30.     Because it met the requirements of 26 U.S.C. §3134, South Delta filed its claim for ERC credits for the second and third quarters of 2020 (Q2-2020 & Q3-2020) and the first three quarters of 2021 (Q1-2021, Q2-2021 & Q3-2021).[24]

---

[19]     Id.
[20]     Pub. L. 117-58, § 80604, 135 Stat. 429, 1341 (Nov. 2021). https://www.congress.gov/117/plaws/publ58/PLAW-117publ58.pdf (last visited 10/18/25).
[21]     Id.
[22]     In re Glob. Aviation Techs. LLC, No. 23-10111, 2024 WL 3506432, at *1 (Bankr. D. Kan. July 19, 2024).
[23]     Id.

31.     Initially, on June 26, 2023, the IRS issued refund checks to South Delta for Q2-2020 and Q3-2020, as well as Q1-2021 and Q2-2021.[25]

32.     These were checks in the amounts of $285,533.68, $13,108.42, $408,972.24, and $412,046.03, respectively.[26] These represent the amount of South Delta's ERC claim for those four quarters plus interest to the date those checks were issued.

33.     On December 11, 2023, however, the IRS sent Form 6362 Letters for each of the quarters it had paid, Q2-2020, Q3-2020, Q1-2021 and Q2-2021, in which the IRS stated it was proposing to disallow these quarters because South Delta was not an eligible governmental employer.[27]

34.     This was the only reason given by the IRS for its proposed disallowance of South Delta's paid credits.

35.     South Delta timely responded to the IRS's 6362 letters by the date prescribed in the letters.[28]

36.     In its response, South Delta informed the IRS that South Delta was not a state or local government or political subdivision of a state or local government, and, therefore, it was eligible to receive the ERC.

---

[24]     See, Exhibit "1" South Delta's 941-Xs for Q2-2020 & Q3-2020 and Q1-2021, Q2-2021, & Q3-2021, and the Form 2848 Power of Attorney that was attached to each 941-X.
[25]     See, Exhibit "5", copies of the IRS refund checks for these quarters.
[26]     Id.
[27]     See, Exhibit "3",  December 11, 2023, Disallowance letters.
[28]     See, Exhibit "6", South Delta's 6362 Response (without attachments).

37.     South Delta is a private nonprofit corporation, organized in 1966 and operated continuously as such since that time. South Delta is not a governmental entity under Mississippi law.[29]

38.     At all material times, South Delta is and has been a tax-exempt organization as described in I.R.S. Code Sec. 501(c)(3).

39.      South Delta has been exempt from corporate income taxes since April 29, 1976 (over 47 years ago), when the IRS granted its Sec. 501(c)(3) status.[30]

40.     Governmental entities are not entitled to Sec. 501(c)(3) status under the IRS's own rules.[31]

41.     Even after receiving South Delta's response, the IRS refused to correct its misperception and again sent disallowance notices for Q1 and Q2 of 2021.[32]

42.     In these letters, the IRS alleged that South Delta was covered by a Section 218 agreement between Mississippi and the Social Security Administration.[33]

43.     South Delta is not covered by a Section 218 Agreement.

44.     The IRS also alleged in its response that South Delta "agreed that you are properly classified as a governmental entity." [34]

45.     This assertion by the IRS is demonstrably false.

---

[29]     See Kinney v. S. Miss. Planning & Dev. Dist., Inc., 202 So. 3d 187 (Miss. 2016); see also Mississippi Attorney General Opinion (Opinion No. 2004-0103, March 9, 2004); see also Mississippi Attorney General Opinion (November 8, 1990).

[30]     See, Exhibit "2," South Delta's 501(c)(3) status from the IRS.

[31]     https://www.irs.gov/charities-non-profits/charitable-organizations/exemption-requirements-501c3-organizations (last visited 11/12/25).

[32]     See, Exhibit "7," November 6, 2024, Letters.

[33]     Id. at pg. 2.

[34]     Id. at pg. 3.

8

46.     South Delta is not a governmental entity and never admitted to being a governmental entity in its response to the IRS's 6362 Letters.[35]

47.     These were the only reasons given by the IRS for disallowing South Delta's ERC credits.

48.     The IRS wrongfully and without substantial justification denied South Delta's ERC; South Delta timely filed its appeal.

**Threshold Requirement – 3 Ways to Qualify for an ERC**

49.     South Delta is an employer who was carrying on a trade or business during calendar years 2020 and 2021 with respect to all operations of the organization.

50.     South Delta is an eligible employer under the provisions of the CARES Act, as amended.

51.     An employer is eligible to claim the ERC in a given quarter if either: (1) its operations were at least partially suspended by an appropriate governmental order limiting commerce, travel or gatherings (the "suspension test"), (2) it experienced a specified decline in its gross receipts for such calendar quarter, as compared to the corresponding calendar quarter in 2019 (the "gross receipts test"), or (3) it was a recovery start up business.  26 U.S.C. § 3134(c)(2)(A).

52.     South Delta meets the suspension test for an ERC claim.  South Delta claimed ERC for Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021 using 941-X forms, as it is a private, tax-exempt 501(c)(3) organization and is entitled under the law and the facts and circumstances of this case to receive ERC credits for those tax quarters.

---

[35]     See, Exhibit "6", South Delta's 6362 Response (without attachments).

53.     Before incorrectly determining that South Delta was a "governmental entity," the IRS paid Q2-2020 and Q3-2020 and Q1-2021 and Q2-2021.[36]

54.     Therefore, the IRS has already correctly determined that South Delta meets the remaining requirements of 26 U.S.C. § 3134(c)(2)(A).

55.     In its disallowance of South Delta's ERC refund claims, the only reasons given were 1) that South Delta was a governmental entity; 2) South Delta was covered by a Section 218 Agreement between the State and the Social Security Administration; and 3) South Delta admitted to being a governmental entity.[37]

56.     The IRS never disallowed South Delta's ERC claims for failure to meet any other requirement or qualification under the CARES Act, as amended.[38]

57.     As the only reasons the IRS gave for denying South Delta's ERC claims are incorrect both factually and legally, South Delta is entitled to receive ERC credits for Q2-2020, Q3-2020, Q1-2021, and Q2-2021.

58.     The IRS has never addressed South Delta's ERC claim for Q3-2021.

59.     South Delta is entitled to receive its ERC credits for Q3-2021.

**The Suspension Test**

60.     A business like South Delta can qualify as an eligible employer to receive ERC using the suspension test.

---

[36]     See, Exhibit "5", copies of the IRS refund checks for these quarters.
[37]     See, Exhibit "3", December 11, 2023, Disallowance letters; see also Exhibit "7", November 6, 2024, Letters.
[38]     In December 2024, after it had wrongfully denied South Delta's ERC claim, the IRS sent a letter to South Delta informing it that it had miscalculated the amount of its ERC claim based on the number of employees it had. See, Exhibit "8", December 16, 2024, letter.  But after South Delta protested this and provided additional information, the IRS agreed with South Delta that the amount of its claim was correct.  See, Exhibit "9", February 24, 2025, letter.

61. Under this prong for determining eligibility, an employer is eligible to claim ERC credits if "the operation of [South Delta's] trade or business [was] fully or partially suspended. . . due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID-19)." 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

62. South Delta meets the requirements of 26 U.S.C. § 3134(c)(2)(A)(ii)(I).

63. Eligibility under the "suspension test" contains no financial element whatsoever.

64. The provisions set out in 26 U.S.C. § 3134(c)(2)(A)(ii)(I) do not require eligible employers to have suffered any decline in gross receipts at all to qualify for ERC credits.

65. The provisions set out in 26 U.S.C. § 3134(c)(2)(A)(ii)(I) do not require an employer's business to shut down entirely at any point at all during the pandemic.

66. The provisions set out in 26 U.S.C. § 3134(c)(2)(A)(ii)(I) do allow an eligible employer to qualify for an ERC refund if it was either "fully or partially suspended" during the calendar quarter it is claiming.

67. And that full or partial suspension was "due to" orders from "*an* appropriate governmental authority". 26 U.S.C. § 3134(c)(2)(A)(ii).

68. Under the provisions set out in 26 U.S.C. § 3134(c)(2)(A)(ii)(I), the "appropriate governmental order" needs only to "*limit*[] commerce, travel, or group meetings (for commercial, social, religious, or other purposes)" and be "due to the coronavirus disease 2019 (COVID–19)."

69. In March 2021—roughly a year after Congress passed the CARES Act—the IRS published a 102-page guidance document titled "Notice 2021-20" which was intended to "aid

taxpayers in calculating and claiming the [ERC]" and provide answers to "Frequently Asked Questions" about the CARES Act.[39]

70.     The partial suspension guidance provided by Notice 2021-20 reflects a safe harbor and allows for a "facts and circumstances" eligibility determination.

71.     The IRS never issued regulations to facilitate the ERC program.[40]

72.     Notice 2021-20 did not undergo the APA's notice-and-comment rulemaking requirement.

73.     In part, Notice 2021-20 states that "an employer that operates an essential business may be considered to have a partial suspension of operations if, under the facts and circumstances, more than a nominal portion of its business operations are suspended by a governmental order."[41]

74.     In part, Notice 2021-20 states "If all, or all but a nominal portion, of an employer's business operations may continue, but the operations are subject to modification due to a governmental order (for example, to satisfy distancing requirements), such a modification of operations is considered to be a partial suspension of business operations due to a governmental order if the modification required by the governmental order has more than a nominal effect on the business operations under the facts and circumstances."[42]

75.     The IRS also issued guidance on its definition of what it considered to be a "more than nominal" effect for purposes of the suspension test. In part, Notice 2021-20 provided the following:

---

[39]     See, IRS Notice 2021-20 at https://www.irs.gov/pub/irs-drop/n-21-20.pdf (last visited 11/12/25).

[40]     See, Pub. L. 116-136, 134 Stat. 281, at §2301(l), and as amended, I.R.C. §3134(m).

[41]     *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act* IRS Notice 2021-20 *(Answer 11)*.

[42]     *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act* IRS Notice 2021-20 *(Answer 17)*.

Solely for purposes of this employee retention credit, a portion of an employer's business operations will be deemed to constitute more than a nominal portion of its business operations if either *(i) the gross receipts from that portion of the business operations is not less than 10 percent of the total gross receipts (both determined using the gross receipts of the same calendar quarter in 2019),* or (ii) the hours of service performed by employees in that portion of the business is not less than 10 percent of the total number of hours of service performed by all employees in the employer's business (both determined using the number of hours of service performed by employees in the same calendar quarter in 2019).[43]

76. According to Notice 2021-20, then, if an employer shows a greater than 10 percent reduction of gross receipts or service hours performed by employees for the claimed quarter when compared to the same calendar quarter in 2019 (that is due to a governmental order) then the employer has shown that it has suffered a more than nominal effect on its business operations. With this showing, the IRS will treat the employer as a qualified employer under the suspension test, eligible to receive the claimed ERC for that quarter.[44]

77. The government has taken the position that these methods are not the only ways of showing that a governmental order has had more than a nominal effect on the operations of a business and that an employer's qualification is based on the "facts and circumstances" of each case.[45]

78. In determining an employer's qualification to receive an ERC, neither 26 U.S.C. § 3134(c)(2)(A)(ii)(I) nor any other provision of the law provides or establishes a definition of

---

[43]    *Id. (Answer 11)* (emphasis added).

[44]    See Notice 2021-20 *(Answers 11 & 17).* The IRS has acknowledged that a partial suspension is something between a full suspension and no suspension. See, Exhibit "10", United States' Opposition to Motion for Summary Judgment and Cross Motion for Summary Judgment, *Stenson Tamaddon, LLC v. US Internal Revenue Service, et al.*, Case 2:24-cv-01123-SPL, US Dist. Ct. for the Dist. of AZ (Doc. 44, page 7).

[45]    See, Exhibit "10", United States' Opposition to Motion for Summary Judgment and Cross Motion for Summary Judgment, *Stenson Tamaddon, LLC v. US Internal Revenue Service, et al.*, Case 2:24-cv-01123-SPL, US Dist. Ct. for the Dist. of AZ (Doc. 44, page 7).

"partial suspension" or "limiting" that sets a minimum percentage reduction measured by revenue, hours or otherwise as a requirement to qualify to receive an ERC refund.

79.     In filings before another court, the government has admitted that "[e]ffectively, this is a safe harbor; taxpayers whose gross receipts or hours have been impacted [10 percent or greater] can rely on the IRS not denying their ERC claim on that basis."[46]

80.     In the same filing, it also admitted that, in evaluating whether a "nominal portion" of a business's operations were suspended, the "plain language of the Notice" requires the IRS to consider all "facts and circumstances" of the business's operations.[47]

### SOUTH DELTA PLANNING & DEVELOPMENT DISTRICT QUALIFIES UNDER THE SUSPENSION TEST

#### Applicable Governmental Orders

81.     South Delta was required and directed to comply with the provisions of appropriate government orders related to COVID-19 during Q2-2020 and Q3-2020, and Q1-2021, Q2-2021, and Q3-2021.

82.     On March 4, 2020, the Centers for Medicaid and Medicare Services (CMS), the agency responsible for Medicaid and Medicare, issued a "call to action" wherein it reminded healthcare providers that it required healthcare providers, such as South Delta, who received funds from either Medicare or Medicaid, to maintain infection control and prevention policies as a condition for participation in the program.

83.     CMS required that all healthcare providers had to immediately review their policies to ensure compliance with CMS' infection control standards as well as CDC guidelines.

---

46      Id.
47      Id.

14

84.     The announcement made it clear that CMS would hold providers accountable for effective infection control standards.

85.     As a Medicaid contractor, South Delta was required to follow the orders and directives issued by Medicaid.

86.     On March 14, 2020, Gov. Tate Reeves issued a Proclamation declaring that a "State of Emergency exists in the State of Mississippi".[48] In this Proclamation, Gov. Reeves directed that the "State Health Officer shall inform members of the public on how to protect themselves and actions being taken in response to this outbreak."[49]

87.     On March 16, 2020, Gov. Tate Reeves issued Exec. Order No. 1458, wherein he "order[ed] and direct[ed]" that "all State agencies, boards, commissions, Mississippi school districts, and other state entities…to promptly review and identify which employees perform essential duties to carry out the entity's core functions during the State of Emergency and those employees whose duties are not deemed essential during any period of time during the State of Emergency. And, where feasible, as determined by the entity, if core functions and duties could be performed by essential employees from home in order to minimize the interaction and risk of possible transmission of COVID-19 between employees."[50] Non-essential employees and any employees who could perform their work from home were sent home.[51]

88.     On March 19, 2020, Gov. Tate Reeves issued Order No. 1460, wherein he stated that the "worldwide outbreak of COVID-19 and the effects of its extreme risk of person-to-person transmission throughout the United States and Mississippi significantly impact the life and health

---

[48]     See, Exhibit "11" Proclamation.
[49]     Id.
[50]     https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1458.pdf (last visited 11/12/25).
[51]     Id.

15

of our people, as well as the economy of Mississippi".[52]  Gov. Reeves also stated that "the risk of spread of COVID-19 within Mississippi constitutes a public emergency that may result in substantial injury or harm to life, health,  and property within Mississippi".[53]

89.    In Exec. Order No. 1460, Gov. Reeves also ordered that "all Mississippi public schools shall be closed effective immediately".[54]

90.    On March 24, 2020, Gov. Tate Reeves issued  Order No. 1463.[55]

91.    Exec. Order No. 1463 had no lapse-date and remained in force until the State of Emergency ended on November 20, 2021.[56]

92.    In part, Exec. Order No. 1463 "order[ed] and direct[ed]" that "all Mississippi businesses and non-profit entities likewise utilize, to the maximum extent possible, work from home or other telework procedures."[57] It also "order[ed] and direct[ed]" that "Mississippi residents shall avoid social and non-essential gatherings in groups of more than 10 people where the gatherings [are] in a single space at the same time where individuals are in close proximity to each other."[58]

93.    Exec. Order No. 1463 divided businesses and operations into "essential' or "non-essential".

---

[52]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1460.pdf (last  visited 11/12/25).  This statement was repeated in some variation in Exec. Order Nos. 1463, 1465, 1466, 1470,1473, 1476, 1477, 1478, 1480, 1481, 1483, 1484, 1487, 1488, 1491, 1492, 1496, 1500, 1505, 1508, 1509, 1511, 1514, 1515, 1516, 1517, 1518, 1519, 1520, 1522, 1525, 1527, 1530, 1533, 1535, 1536, 1542, 1543, 1549, 1550, 1551, and 1560.
[53]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1460.pdf (last visited 11/12/25).
[54]    Id.
[55]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1463.pdf (last visited 11/12/25).
[56]    Id.
[57]    Id.
[58]    Id.

94.     In part, Exec. Order No. 1463 "order[ed] and direct[ed]" that "any Essential Businesses or Operation…may operate at such level as necessary to provide such essential services or functions and shall not be subject to any 10 person or any other limitation or restriction inconsistent with this Exec. Order but shall take all reasonable measures to ensure compliance with the CDC and the Mississippi Department of Health recommendations and guidance to prevent the spread of COVID-19…."

95.     Additionally, Exec. Order No. 1463 ordered essential business and operations to adhere to practices of social distancing, sending sick employees home, actively encouraging sick employees to stay home, and separating and sending home employees who appear to have respiratory illness symptoms.

96.     Gov. Reeves also "order[ed] and direct[ed]" that "Mississippi residents shall avoid social and non-essential gatherings in groups of more than 10 people where the gatherings [are] in a single space at the same time where individuals are in close proximity to each other."[59]

97.     On March 26, 2020, Gov. Reeves issued the Supplement to Exec. Order No. 1463.[60] It reiterated that "various political subdivisions of Mississippi" had their own power to issue "orders, rules, regulations or resolutions…in response to the national emergency associated with COVID-19" and that any of the "orders, rules, regulations, or resolutions, and actions taken by political subdivisions of the State prior to the issuance of Exec. Order No. 1463 on March 23, 2020, as well as subsequent thereto, [continued] to be in effect and shall not be suspended or unenforceable, so long as the same provide the minimum applicable restrictions set out in Exec. Order No.1463 and do not prevent any Essential Business or Operation as identified in Exec. Order

---

[59]     Id.
[60] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/SupplementEO1463.pdf
(last visited 11/12/25).

No. 1463 from operating at such a level necessary to provide essential services and functions during this COVID-19 state of emergency."[61]

98.    That same day, March 26, 2020, the Mississippi State Department of Health issued its *CMS Elective Surgery and Procedures Recommendation* to limit non-essential adult elective surgery and medical and surgical procedures that incorporated the CDC's detailed guidance necessary to conserve critical healthcare resources, including hospital personnel, medical personnel, medical equipment, and PPE.

99.    On April 1, 2020, Gov. Reeves issued Exec. Order No. 1466 wherein he issued the "Shelter in Place" Order to last until April 20, 2020.[62]

100.    All individuals in Mississippi were "order[ed] and direct[ed]" to "stay at home or in their place or residence" including all "businesses and non-profit entities…except Minimum Operations…."[63] Minimum Operations were defined as "those activities necessary for the business or operation to maintain the condition of the facilities, premises and equipment, value of business inventory, payroll, employee benefits, security, and to facilitate employees of the business or operation to continue to work remotely from their residences."[64]

101.    Essential businesses could remain open but only "at such level as necessary to provide essential services and functions."[65]

102.    Exec. Order No.1466 continued the prohibition from Exec. Order No. 1463 that non-essential groups of more than 10 people shall be cancelled.[66]  Even persons engaged in

---

[61]    Id.
[62]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1466.pdf (last visited 11/12/25).
[63]    Id.
[64]    Id.
[65]    Id.
[66]    Id.

"Essential Travel" or "Essential Business or Operation" were required to adhere to both CDC guidelines and Mississippi Department of Health recommendations and guidance.[67]

103. Moreover, the Shelter in Place Order stated that it "may be enforced by all State, County and Local law enforcement, as well as by other government entities (such as State and local departments of health) to the fullest extent under Mississippi law including, *inter alia*, Miss. Code Ann. §§33-15-11(b)(5) and 33-15-11(b)(6)."[68] It also stated that "[v]iolations of this Executive Order are subject to the provisions of Miss. Code Ann.§33-15-43."[69]

104. In this Ex. Order, Gov. Reeves explicitly delegated authority to issue and enforce quarantine and isolation orders to the State Health Officer.[70] The Order stated that "the State Health Officer . . . is authorized and empowered to issue such orders as necessary to carry out, implement, and enforce quarantine or isolation orders to contain and restrict transmission of COVID-19."[71]

105. Local Orders, issued by either counties or municipalities, also impacted South Delta too. For example, the City of Indianola issued an Order on April 4, 2020, mandating the closure of all adult daycare centers within it.

106. This is not the only local order that impacted South Delta, but merely an example of one. Similar Orders were issued in towns and counties around the Delta.

107. On April 17, 2020, Gov. Reeves extended the Shelter in Place Order through April 27, 2020, through Exec. Order No. 1473.[72]

---

[67]   Id.

[68]   Id. This statement was repeated in some variation in Exec. Order Nos. 1477, 1483, 1492, 1509, 1525, 1527, 1535, 1549, and 1551, most of which were extended multiple times.

[69]   Id. This statement was repeated in some variation in Exec. Order Nos. 1477, 1483, 1492, 1509, 1525, 1527, 1535, 1549, and 1551, most of which were extended multiple times.

[70]   https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1466.pdf (last visited 11/12/25).

[71]   Id.

[72]   https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1473.pdf (last visited 11/12/25).

108. On April 22, 2020, in Exec. Order No. 1476, Gov. Reeves "order[ed] and direct[ed]" that "Mississippi public school buildings shall remain closed to the public through the remainder of the 2019-2020 academic school year."[73]

109. It also mandated that "[o]n or before June 1, 2020, each school district shall submit to the Mississippi State Board of Education for approval its plan for summer learning and enrichment measures necessary to (a) mitigate disruption from the Spring 2020 school closure due to COVID-19 and (b) to enhance learning in preparation for 2020-2021 academic school year."[74]

110. That is because in Mississippi, the School Board (Board of Trustees) of each public school district has the primary governing power of the district, including the authority to organize, operate, and contract for the benefit of the district.[75] The Mississippi Code provides "Each school district in the state shall be a political subdivision with the name of the district being _____ School District."[76]

111. On April 24, 2020, Gov. Reeves issued Exec. Order No. 1477, the "Safer at Home" Order.[77] This Order began on April 27, 2020, and continued through May 11, 2020.[78]

112. The Safer at Home Order "order[ed] and direct[ed]" that all Mississippians were encouraged to stay at home but continued the requirement that those who left home "shall"

---

[73] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1476.pdf (last visited 11/12/25).
[74] Id.
[75] Miss. Code Ann. § 37-6-5; 37-7-301.
[76] Miss. Code Ann. § 37-6-5; Gressett By &Through Gressett v. Newton Separate Mun. Sch. Dist., 697 So.2d 444, 446 (Miss.1997) (citing Miss. Code Ann. § 11–46–1(i) (Rev.2004)); Jones Cnty. Sch. Dist. v. Dept of Revenue, 111 So. 3d 588, 599 (Miss. 2013).
[77] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1477.pdf (last visited 11/12/25).
[78] Id.

maintain social distancing of a minimum of 6 ft. distance and "shall avoid" gathering in groups of more than 10 people.[79]

113.    The Safer at Home Order, Exec. Order No. 1466, cancelled public and private social and other non-essential gatherings in groups of more than 10 people and dine-in meal service.  It also required businesses and non-profit entities to take all reasonable measures to comply with MSDH and CDC regulations, orders, and guidelines to prevent COVID.

114.    For "[a]ll vulnerable individuals, including elderly individuals (aged 65 or older per CDC guidelines) and individuals with serious underlying health conditions," the Shelter in Place order from Exec. Orders Nos. 1466 and 1467 was still in place.[80]

115.    Exec. Order No. 1477 did allow businesses and non-profits to reopen, subject to limitations, including "order[ing] and direct[ing]" that they "utilize, to the maximum extent possible, work from home or other telework procedures."[81] It also "order[ed] and direct[ed]" that all businesses and non-profits "shall take all reasonable measures to ensure compliance with the Mississippi State Department of Health and CDC regulations, orders, and guidelines to prevent the spread of COVID-19…."[82]

116.    Exec. Order No. 1477 also "order[ed] and direct[ed]" that "[t]o the extent possible, all common areas where employees or customers are likely to congregate and interact shall be closed or strict social distancing protocols should be enforced…."[83]

---

[79]    Id.
[80]    Id.
[81]    Id.
[82]    Id.
[83]    Id.

117.    Exec. Order No. 1477 also "order[ed] and direct[ed]" that "[e]very effort should continue to be made to deliver care without being in the same physical space, such as utilizing telehealth, phone consultations, and physical barriers between providers and patients."[84]

118.    Moreover, the Order stated that it "may be enforced by all State, County and Local law enforcement, as well as by other government entities (such as State and local departments of health) to the fullest extent under Mississippi law including, *inter alia*, Miss. Code Ann. §§33-15-11(b)(5) and 33-15-11(b)(6)."[85] It also stated that "[v]iolations of this Executive Order are subject to the provisions of Miss. Code Ann. §33-15-43."[86]

119.    On May 8, 2020, Gov. Reeves issued Exec. Order No. 1480, which extended the "Safer at Home" Order in Exec. Order No. 1477 to May 25, 2020.[87]

120.    On May 11, 2020, Gov. Reeves issued Exec. Order No. 1481 wherein he acknowledged the "unprecedented number of Unemployment Insurance claims" that had been filed "during this time of emergency …(…more than 36,000 per week)".[88]  This Order made it easier for MDES to process those claims.[89]

121.    On May 22, 2020, Gov. Reeves issued Exec. Order No. 1488, which extended the Safer at Home Order issued in Exec. Order No. 1477, and amended by Orders 1478, 1480, 1484, and 1487.[90] It was extended until June 1, 2020.[91]

---

[84]    Id.
[85]    Id.
[86]    Id.
[87]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1480.pdf (last visited 11/13/25).
[88]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1481.pdf (last visited 11/13/25).
[89]    Id.
[90]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1488.pdf (last visited 11/13/25).
[91]    Id.

122. On May 28, 2020, Gov. Reeves issued Exec. Order No. 1492, or the "Safe Return" Order.[92] It was to take effect on June 1, 2020, and last until June 15, 2020.[93]

123. "Vulnerable individuals, including elderly individuals…and individuals with serious underlying health conditions" were "order[ed] and direct[ed]" to follow the "Safer at Home" protocols.[94]

124. In the Safe Return Order, businesses and non-profits could reopen, subject to limitations. Once again, they were "order[ed] and direct[ed]" to "continue utilizing work from home or other telework procedures" and that they "shall make reasonable, good faith efforts to comply with the Mississippi State Department of Health's and the CDC's regulations and guidelines to prevent the spread of COVID-19…."[95]

125. The Safe Return Order required that "[a]ll employees shall be required to report any symptoms of COVID-19 to their supervisor and any employee who exhibits any of the symptoms of COVID-19 during their shift shall be sent home immediately."[96]

126. The Safe Return Order still "order[ed] and direct[ed]" healthcare professionals that "[e]very effort should continue to be made to deliver care without being in the same physical space, such as utilizing telehealth, phone consultations, and physical barriers between providers and patients."[97]

127. Under the "Safe Return" Order, travel could resume but all "[n]on-essential business travel should be minimized . . . ."[98]

---

[92] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1492.pdf (last visited 11/13/25).
[93] Id.
[94] Id.
[95] Id.
[96] Id.
[97] Id.
[98] Id.

128. The "Safe Return" Order still "order[ed] and direct[ed]" that "all common areas where employees or customers are likely to congregate and interact shall be closed or strict social distancing protocols should be enforced (maintaining a minimum of 6 feet distance between individuals and no gatherings in groups of more than 20 people)."[99]

129. Reception halls and conference centers were allowed to reopen, but guests were limited to "25% of maximum seating capacity."[100]

130. Once again, the Order stated that it "may be enforced by all State, County and Local law enforcement, as well as by other government entities (such as State and local departments of health) to the fullest extent under Mississippi law including, *inter alia*, Miss. Code Ann. §§33-15-11(b)(5) and 33-15-11(b)(6)."[101] It also stated that "[v]iolations of this Executive Order are subject to the provisions of Miss. Code Ann. §33-15-43."[102]

131. And Exec. Order No. 1492, repeated the "order and direct[ion]" that "[n]othing in this Executive Order shall limit or alter the authority of any local or county authority from adopting orders, rules, regulations, and actions that are more strict than established herein, provided that they do not impose restrictions that prevent any Essential Business Operations as identified in Executive Order 1463 as Supplemented from operating at such levels as necessary to provide essential services and functions during this COVID-19 State of Emergency."[103]

132. On June 10, 2020, Gov. Reeves extended the Safe Return Order, through Exec. Order No. 1496, to June 29, 2020.[104]

---

[99] Id.
[100] Id.
[101] Id.
[102] Id.
[103] Id.
[104] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1496.pdf (last visited 11/13/25).

133. On June 26, 2020, Gov. Reeves again extended the Safe Return Order, through Exec. Order No. 1500, to July 6, 2020.[105]

134. On July 2, 2020, Gov. Reeves again extended the Safe Return Order, through Exec. Order No. 1505, to July 20, 2020.[106]

135. On July 8, 2020, Gov. Reeves signed into law Miss. Code Ann. § 11-71-5 as part of Senate Bill 3049.[107]

136. Miss. Code Ann. §11-71-3 and § 11-71-5 provided civil immunity protections for individuals and businesses in relation to COVID-19 exposure, under the Mississippi Back-to-Business Liability Assurance and Health Care Emergency Response Liability Protection Act 7963, ("Premises Liability Immunity statute"). An excerpt from the statute detailing premises liability immunity to property controllers states: "Premises Liability Immunity: Owners, lessees, occupants, or anyone in control of a property who invites or permits others onto the premises and attempts in good faith to follow public health guidance are also protected from civil suits related to COVID-19 exposure."[108]

137. The Premises Liability Immunity statute took effect retroactively on March 14, 2020, and remained in force until one year after the COVID-19 state of emergency ended, which was November 12, 2022.

138. In performing services or as owner or lessee of a premises, South Delta was required to make a good faith effort to follow applicable public health guidance in order to avoid

---

[105] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1500.pdf (last visited 11/13/25).
[106] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1505.pdf (last visited 11/13/25).
[107] https://billstatus.ls.state.ms.us/documents/2020/pdf/SB/3000-3099/SB3049SG.pdf (last visited 11/12/25).
[108] Id.

25

liability claims for civil damages for injuries or death resulting from or related to actual or alleged exposure or potential exposure to COVID-19.

139. In performing services or as owner or lessee of a premises, a failure to make a good faith effort to follow applicable public health guidance carried the repercussions of losing the protection of law against claims for civil damages for injuries or death resulting from or related to actual or alleged exposure or potential exposure to COVID-19.

140. On July 10, 2020, Gov. Reeves issued Exec. Order No. 1507, which extended the Safe Return Order and specifically targeted certain counties that had been identified as higher risk for COVID-19, including Sunflower and Washington, two counties that South Delta covered and had locations in.[109] Exec. Order No. 1507 was active from July 10, 2020, through July 20, 2020.

141. Exec. Order No. 1507 ordered businesses to follow CDC and MSDH regulations, orders and guidance as well as initiating delineated practices to combat the spread of COVID-19, including daily employee health screening, including a mandatory list of questions, mandatory social distancing in all work areas, use of PPE, limitations on gathering size, hygiene practices, mandatory isolation for sick employees and other measures.[110]

142. The Order further mandated that each employee had to be screened at the beginning of his shift, and mandated that the employee be asked, at a minimum, a series of questions.[111] It required that all employees report any COVID-19 symptoms to their employers and any employee with COVID-19 symptoms be sent home.[112] It also required that all employees wear appropriate PPE and that all employees be given hand sanitizer.[113]

---

[109] Id.
[110] Id.
[111] Id.
[112] Id.
[113] Id.

143. On July 19, 2020, through Exec. Order No. 1508, Gov. Reeves again extended the Safe Return Order, which was in force from July 20, 2020, to August 3, 2020.[114]

144. On July 19, 2020, Gov. Reeves issued Exec. Order No. 1509.[115] This Order identified additional "higher risk" counties; three of which were in South Delta's area of coverage, Bolivar, Humphreys, and Sharkey.[116] Sunflower and Washington Counties continued to be named in the Order.[117]

145. Based on Exec. Order No. 1509, five of the six counties South Delta regularly operated in were labeled "higher risk" counties.

146. Exec. Order No. 1509 had the same requirements as Order No. 507 but added additional requirements, including that all individuals "shall maintain social distancing of a minimum of 6 feet distance between individuals not in the same household."[118]

147. On July 30, 2020, Gov. Reeves issued Exec. Order No. 1514 wherein he extended the Safe Return Order, which originated in Exec. Order No. 1492, and was amended by Orders 1496, 1500, 1505, and 1508.[119] The Safe Return Order was extended to August 17, 2020.[120]

148. On July 30, 2020, Gov. Reeves issued Exec. Order No. 1515, wherein he addressed "higher risk" counties, including Bolivar, Humphreys, Sharkey, Sunflower, and Washington

---

[114] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1508.pdf (last visited 11/13/25).

[115] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1509.pdf (last visited 11/13/25).

[116] Id.

[117] Id.

[118] Id.

[119] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1514.pdf (last visited 11/13/25).

[120] Id.

Counties.[121] It extended the requirements of Safe Return Order through August 17, 2020, for these counties but subjected them to the additional requirements found in Exec. Order No. 1509.[122]

149.    On August 4, 2020, Gov. Reeves issued Exec. Order No. 1517, in which he identified counties that remained at a higher risk for COVID-19 transmission, including Bolivar, Sunflower, and Washington.[123] Because of this, Gov. Reeves determined it was "necessary to delay the start of the 2020-2021 academic year for grades seven through twelve" in those counties until August 17, 2020.[124]

150.    On August 4, 2020, the Mississippi Department of Health issued its first mandatory COVID isolation Order.[125] It ordered that "[a]ll persons residing in Mississippi must immediately home-isolate on first knowledge of infection with COVID-19."[126] And that "[p]ersons infected with COVID-19, and not hospitalized, **must** remain in the home or other appropriate residential location for 14 days from onset of illness (or from the date of a positive test for those who are asymptomatic)."[127] Furthermore, it provided that "[t]he failure or refusal to obey the lawful order of a health officer is, at a minimum, a misdemeanor punishable by a fine of $500.00 (41-3-59) or imprisonment for six months or both. If a life-threatening disease is involved, failure or refusal to obey the lawful order of a health officer is a felony, punishable by a fine of up to $5,000.00 or imprisonment for up to five years or both (41-23-2)."[128]

---

[121]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1515.pdf (last visited 11/13/25).
[122]    Id.
[123]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1517.pdf (last visited 11/13/25).
[124]    Id.
[125]    See, Exhibit "12," Mississippi State Department of Health 08/04/2020 Isolation Order.
[126]    Id.
[127]    Id. (emphasis in original).
[128]    Id.

151. On August 14, 2020, Gov. Reeves issued Exec. Order No. 1518, wherein he extended the requirements of the Safe Return Order until August 31, 2020.[129]

152. On August 31, 2020, Gov. Reeves issued Exec. Order No. 1520, wherein he extended the requirements of the Safe Return Order until September 14, 2020.[130]

153. On September 8, 2020, the Mississippi Department of Health issued a new mandatory Isolation Order requiring people infected with COVID to isolate for ten days instead of fourteen days.[131] The rest of the Order stayed the same as its August 4, 2020, Isolation Order, including possible jail time and fines for violating it.

154. On September 13, 2020, Gov. Reeves issued Exec. Order No. 1522, wherein he extended the requirements of the Safe Return Order until September 30, 2020.[132]

155. On September 30, 2020, Gov. Reeves issued Exec. Order No. 1525, the Safe Recovery Order, which rescinded Exec. Order No. 1492 and all its amendments and Exec. Order No. 1517, and was designated to remain in place until November 11, 2020.[133]

156. Under Exec. Order No. 1525, all businesses and non-profit organizations were "order[ed] and direct[ed]" that they "shall make all reasonable, good faith efforts to comply with the CDC's and Mississippi State Department of Health's regulations and guidelines to prevent the spread of COVID-19…"[134]

---

[129] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1518.pdf (last visited 11/13/25).

[130] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1520.pdf (last visited 11/13/25).

[131] See, Exhibit "13", Mississippi State Department of Health 09/08/2020 Isolation Order.

[132] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1522.pdf (last visited 11/13/25).

[133] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1525.pdf (last visited 11/13/25).

[134] Id.

157.    Moreover, among other requirements, the Order limited the number of customers/visitors in the business to "75% of the business's capacity, provided a minimum of six feet social distancing may be maintained between persons not of the same household."[135]

158.    On November 10, 2020, Gov. Reeves issued Exec. Order No. 1530, which extended the "Safer Return" Order to December 11, 2020.[136] It also further identified "higher risk" counties, again identifying Humphreys County.[137] For the higher-risk counties, Exec. Order No. 1530 extended the requirements of Exec. Orders Nos. 1527 and 1528.[138]

159.    On November 17, 2020, the Mississippi Department of Health issued an "Order for the Quarantine of All Household Members of a Person with COVID-19" which required that "[a]ll household members of a person diagnosed with COVID-19 in Mississippi must immediately home-quarantine for at least 14 days from the date of last exposure to the infected person."[139] The only exception was if an employer deemed the worker essential; then that person could go to work, provided they had no symptoms consistent with COVID-19.[140] Failure to obey this order was also punishable by fines and possible imprisonment.[141]

160.    That same day, the Mississippi Department of Health issued another mandatory Isolation Order.[142] It again ordered that "[a]ll persons residing in Mississippi must immediately

---

[135]    Id.
[136]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1530.pdf (last visited 11/13/25).
[137]    Id.
[138]    See https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1527.pdf  and https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1528.pdf (last visited 11/13/25).
[139]    See, Exhibit "14", Mississippi State Department of Health 11/17/2020 Household Quarantine Order.
[140]    Id.
[141]    Id.
[142]    See, Exhibit "15", Mississippi State Department of Health 11/17/2020 Isolation Order.

home-isolate on first knowledge of infection with COVID-19."[143] It also ordered that "[p]ersons infected with COVID-19 **must** remain in the home or other appropriate residential location for 10 days from onset of illness (or 10 days from the date of a positive test for those who are asymptomatic). A negative test for COVID-19 is not required to end isolation at the end of 10 days, but you must be fever free for at least 24 hours with improvement of other symptoms."[144] It also provided punishment via fines and possible imprisonment for violation.[145]

161.    On November 24, 2020, Gov. Reeves issued Exec. Order No. 1532, further amending Exec. Order No. 1527 and establishing that its requirements also applied to Bolivar County.[146]

162.    On December 1, 2020, Gov. Reeves issued Exec. Order No. 1533, further amending Exec. Order No. 1527 and establishing that its requirements also applied to Sunflower and Washington Counties.[147]

163.    On December 9, 2020, Gov. Reeves issued Exec. Order No. 1535, which repealed Exec. Order No.1525, his original Safe Recovery Order, and replaced it with a new Safe Recovery Order, which was to last until January 15, 2021.[148]

164.    Once again, all businesses and non-profits were "order[ed] and direct[ed]" that they "shall make all reasonable, good faith efforts to comply with the CDC's and Mississippi State

---

[143]    Id.
[144]    Id. (emphasis in original).
[145]    Id.
[146]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1532.pdf (last visited 11/13/25).
[147]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1533.pdf (last visited 11/13/25).
[148]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1535.pdf (last visited 11/13/25).

Department of Health's regulations and guidelines to prevent the spread of COVID-19…"[149] Moreover, the Order limited the number of customers/visitors in the business to "75% of the business's capacity, provided a minimum of six feet social distancing may be maintained between persons not of the same household."[150]

165. On December 9, 2020, Gov. Reeves issued Exec. Order No. 1536, which again identified "higher risk" counties for the transmission of COVID-19.[151]

166. Once again, relevant to South Delta, Bolivar and Washington Counties were on that list.[152] And once again, Exec. Order No. 1536 established requirements in addition to Exec. Order No. 1535 for the higher-risk counties.[153]

167. On December 10, 2020, the Mississippi Department of Health issued an updated "Order for the Quarantine of All Household Members of a Person with COVID-19."[154] It ordered that "[a]**ll household members of a person diagnosed with COVID-19 in Mississippi must immediately home-quarantine for a minimum of 10 days (or 7 days with negative testing) consistent with MSDH guidelines** (https://msdh.ms.gov/msdhsite/_static/resources/11825.pdf))."[155] The rest of the Order remained unchanged from the November Order, including the same potential fines and possible imprisonment for violating it.

---

[149]   Id.
[150]   Id.
[151]   https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1536.pdf (last visited 11/13/25).
[152]   Id.
[153]   Id.
[154]   See, Exhibit "16," Mississippi State Department of Health 12/10/2020 Household Quarantine Order.
[155]   Id. (emphasis in original).

168. On December 22, 2020, Gov. Reeves issued Exec. Order No. 1539, which again identified "higher risk" counties for the transmission of COVID-19 and added, relevant to South Delta, Humphreys and Sunflower Counties to that list.[156] They, too, were subjected to the additional requirements in Exec. Order No. 1536.[157]

169. On January 15, 2021, Gov. Reeves issued Exec. Order No. 1542, which extended the statewide "Safe Recovery" Order in Exec. Order No. 1535 until February 3, 2021.[158]

170. On February 3, 2021, Gov. Reeves issued Exec. Order No. 1543, which extended the statewide Safe Recovery Order in Exec. Order No. 1535 until March 3, 2020, and also extended the additional, jurisdiction-specific measures pursuant to Exec. Order No. 1536, as amended by Exec. Order No.1539.[159]

171. On March 2, 2021, Gov. Reeves issued Exec. Order No. 1549, wherein he repealed Exec. Orders 1535 and 1536 and all amendments thereto.[160]

172. Despite doing this, Exec. Order No. 1549, still "order[ed] and direct[ed]" that "[a]ll businesses and non-profits are encouraged to make reasonable, good-faith efforts to comply with the CDC's and Mississippi State Health Department's regulations and guidelines to prevent the spread of COVID-19 . . . ."[161]

---

[156] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1536.pdf (last visited 11/13/25).
[157] Id.
[158] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1539.pdf (last visited 11/13/25).
[159] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1543.pdf (last visited 11/13/25).
[160] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1549.pdf (last visited 11/13/25).
[161] Id.

173. On March 31, 2021, Gov. Reeves issued Exec. Order No. 1550, which extended Exec. Order No. 1549 until April 30, 2021.[162]

174. On April 30, 2021, Gov. Reeves issued Exec. Order No. 1551, wherein he repealed Exec. Orders 1549 and 1550.[163] Despite doing this, Exec. Order No. 1551, still "order[ed] and direct[ed]" that "[a]ll businesses and non-profits are encouraged to make reasonable, good-faith efforts to comply with the CDC's and Mississippi State Health Department's regulations and guidelines to prevent the spread of COVID-19 . . . ."[164]

175. Other than for the requirement to wear face coverings, there was no expiration date in Exec. Order No. 1551.[165]

176. On August 20, 2021, the Mississippi Department of Health issued "Order for the Isolation of Individuals Diagnosed with COVID-19."[166] It ordered that "[a]ll persons residing in Mississippi must immediately home-isolate on first knowledge of infection with COVID-19." And that "[a]ll persons, including fully vaccinated individuals, infected with COVID-19 **must** remain in the home or other appropriate residential location for 10 days from onset of illness (or 10 days from the date of a positive test for those who are asymptomatic). A negative test for COVID-19 is not required to end isolation at the end of 10 days, but you must be fever free for at least 24 hours with improvement of other symptoms."[167] The Order again provided that "[t]he failure or refusal to obey the lawful order of a health officer is, at a minimum, a misdemeanor punishable by a fine

---

[162] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1550.pdf (last visited 11/13/25).
[163] https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1551.pdf (last visited 11/13/25).
[164] Id.
[165] Id.
[166] See, Exhibit "17", Mississippi State Department of Health 08/20/2021 Isolation Order.
[167] Id. (emphasis in original).

34

of $500.00 (41-3-59) or imprisonment for six months or both. If a life-threatening disease is involved, failure or refusal to obey the lawful order of a health officer is a felony, punishable by a fine of up to $5,000.00 or imprisonment for up to five years or both (41-23-2)."[168]

177.    Each of the Executive Orders were styled as an "Order" and the actions contained therein was "hereby order[ed]and direct[ed]".  The actions and decisions by South Delta as described below were taken as a result of and due to appropriate Executive Orders.

178.    Each of the Mississippi State Department of Health Orders were styled as an "Order" and the actions contained therein had legal consequences for the failure to follow them. The actions and decisions by South Delta as described below were taken as a result of and due to these Mississippi State Department of Health Orders.

179.    On November 12, 2021, Gov. Reeves issued Exec. Order No. 1560, which terminated the State of Emergency in Mississippi effective 11:59 p.m. on November 20, 2021.[169]

**Impact of the Governmental Orders on South Delta Planning & Development District**

180.    South Delta qualifies for the ERC under the CARES Act because its business operations were partially suspended due to government orders related to COVID-19 that were in effect during Q2-2020 and Q3- 2020 and Q1-2021, Q2-2021, and Q3-2021.

181.    South Delta's headquarters are located in Greenville, Mississippi, and it offers a broad range of services to support civic improvement and economic development.

182.    South Delta contracted with Medicaid to care for Elderly and Disabled persons in its service areas.  It operated under CMS and was subject to CMS requirements.

---

[168]    Id.
[169]    https://www.sos.ms.gov/content/executiveorders/ExecutiveOrders/1560.pdf (last visited 11/13/25).

183. As part of that contract, South Delta provided home care services and deployed teams of social workers and nurses into the communities to deliver necessary care, enabling their patients to remain at home rather than being forced into nursing homes or other congregate care facilities.

184. South Delta's business model is based on face-to-face, in-person therapeutic care programs designed to help its clients improve their day-to-day lives and remain independent, thereby avoiding the need for nursing home care.

185. The applicable Exec. Orders, regulations and guidelines mandating social distancing, ordering that the elderly and vulnerable population shelter in place, ordering that essential businesses "shall" follow the CDC and Mississippi Department of Health guidelines, that non-essential businesses shall attempt in good faith to do the same, and the Medicare/CMS requirements limited South Delta's business to an extent that caused a partial suspension of South Delta's business.

186. Before the COVID-19 orders, a case team consisting of a Registered Nurse and a social worker would travel to potential patients in the community. This travel was a necessary and significant portion of South Delta's operation as a business.

187. As part of South Delta's business operation, South Delta employees would travel to clients' homes and provide services to these clients, such as housekeeping, bathing, grooming needs, visual and verbal evaluation, and other services as needed in the clients' home. South Delta employees would, from time to time, travel with clients to accompany them to appointments with beauty professionals, doctors, and grocery stores, or to provide other tangible support as needed for the health and welfare of the clients. Case managers also coordinated with Medicaid offices to ensure the clients' eligibility remained active and assisted the clients with necessary paperwork.

36

All of these activities, travel and gatherings for legitimate business purposes, were related to providing benefits to the clients and constituted the commerce of South Delta.

188. During each of the applicable tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, the caseload for each team was approximately 115 clients per team, and there were 15 teams at South Delta. Each employee's schedule was different, as South Delta operates in six counties, and the requirement was that all 115 clients be seen by the end of each month.

189. Due to the applicable orders, South Delta teams were unable to enter the patients' homes, and all their work had to be conducted remotely, over the phone. This change of service method was a significant departure from South Delta's normal business operations.

190. Although it took significantly less time to complete, it was much less effective and did not provide the same quality or quantity of service that South Delta's previous method of operation offered.

191. Because of appropriate governmental orders, during each of the applicable tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, South Delta's business actions were limited in that the orders limited South Delta's employees' ability to travel, socially interact with clients, and South Delta was severely limited in adequately servicing the needs of their clients to such an extent that the business of South Delta was partially suspended.

192. During each of the applicable tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, as a separate operation in South Delta's business, South Delta performed workforce training.

193. South Delta performed workforce training in the Delta area of Mississippi, which is the poorest part of the poorest state in the nation. While most of its work is limited to its six

main counties — Bolivar, Sunflower, Washington, Humphries, Sharkey, and Issaquena — South Delta's workforce training operates in 8 additional counties, for a total of 14 Mississippi counties.

194. South Delta's workforce training, prior to COVID-19, included programs such as lineman training, customer service training, and career development for young people. Much of this work is facilitated through the various junior colleges, community colleges, and public schools in those counties.

195. Because of appropriate governmental orders, during each of the applicable tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, the facilities used by South Delta were closed due to appropriate governmental orders and, even when some were allowed to re-open, the limitations on the use, gathering, social interaction and limitations on teaching methods made it impracticable for South Delta's workforce training to continue.

196. Shutting down its workforce training was a significant departure from South Delta's normal business operations. As a result, during Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, South Delta's workforce training operations were partially or fully suspended.

197. Before March 2020, one part of South Delta's operations involved contracting with the Mississippi Department of Human Services to prepare and serve meals to elderly and disabled clients in congregate dining facilities.

198. Additionally, South Delta provided five facilities where elderly and disabled clients could gather, play games, socialize, worship, and engage in other group activities.

199. South Delta also provided meals and, where necessary, assisted in delivering meals to elderly and disabled clients in their homes.

200. Beginning in March 2020 and continuing until the termination of the State of Emergency on November 20, 2021, South Delta operations in this area were severely limited by

restrictions contained in governmental orders, Miss. Code Ann. §11-71-3 and § 11-71-5, the applicable CDC and MSDH orders, regulations, and guidelines, as well as considerations for the health of the elderly and at-risk individuals served by South Delta.

201. During tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, South Delta was forced to suspend activities in its five facilities and to suspend in-dining meal service, social gatherings, meetings, and group activities that it previously operated in order to adhere to appropriate governmental orders, regulations, guidelines and further to protect South Delta's clients from injury or death due to COVID and to avoid actual or potential liability for such injury or death.

202. South Delta changed its operations to provide meals to its clients by modified food delivery, which had previously been a lesser part of its business methods, and which made South Delta's operation more costly, required more travel, and prevented South Delta from providing the other services and benefits it had previously provided to its clients.

203. The impact was so significant that all 5 sites closed did not reopen until 2022.

204. The suspension of in-facility activities at the five sites and the loss of the associated programs were significant and limiting departures from South Delta's normal business operations.

205. Furthermore, the modifications made by South Delta to continue meal service to elderly and disabled clients in their homes resulted in an increase in operational costs and substantially limited South Delta's ability to provide the social services previously offered.

206. Because of appropriate governmental orders, during each of the applicable tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, the commerce of South Delta was limited as set out herein and otherwise to such an extent that the business of South Delta was partially suspended.

207. Prior to March 2020, one of South Delta's operations was in assisting other entities in obtaining and administering economic development grants, either through the state or through HUD.

208. Beginning in March 2020 and continuing until the termination of the State of Emergency on November 20, 2021, South Delta's operations in this area were substantially impeded by state and federal governmental orders that closed the corresponding governmental office(s) involved in reviewing, approving, issuing, administering and/or funding economic development grants.

209. During tax quarters, Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, South Delta's efforts to function in its offices were impeded and limited, and the efforts of other entities that were recipients of these development grants were also impeded and limited to such an extent as to cause a partial suspension of the operation of South Delta.

210. During the tax quarters Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, most grants had specific timeframes within which the grant work had to be implemented and completed. Due to impediments caused by governmental orders, the timeframes could not be reliably met, hindering and limiting South Delta's ability to administer the grants and reducing its revenue.

211. This resulted in significant delays for ongoing projects. For example, on average, South Delta submits 10-15 applications per year for developmental and similar grants, but in 2020, owing to travel, gathering, and other activity restrictions, it submitted only 5 for consideration.

212. The reduction in the number, size, and activity regarding developmental grants substantially limited South Delta's business operation and was a significant departure from South Delta's normal business operations.

213. The Orders also caused South Delta to suffer limitations on its ability to obtain, perform, administer, and receive compensation for home grants administered by the State of Mississippi and the Mississippi Home Corps.

214. As part of its operations, South Delta previously was awarded such housing grants to help underprivileged persons in South Delta's six-county region upgrade their homes to habitable levels.

215. South Delta faced challenges obtaining grants due to governmental orders directing State of Mississippi workers to stay home and then limiting the manner in which these State workers were permitted to perform their services, thereby limiting the pace and efficiency with which they were able to review, approve, issue, administer, and/or fund housing development grants.

216. During these tax quarters, and in compliance with appropriate governmental orders, Mississippi Home Corps workers were ordered to work from home, which limited their ability to travel, gather, and function, thereby impeding South Delta's ability to obtain and perform housing development grants.

217. During these tax quarters and in compliance with appropriate governmental orders, contractors involved in upgrading the subject homes under housing grants were limited in their ability to perform, both because they were subject to governmental orders and by an inability to obtain necessary supplies to fulfill the required work.

218. As a result, South Delta was limited and impeded in its ability to administer and complete housing grants. Because of this, South Delta is years behind in the performance and completion of these housing grants.

219. During tax quarters Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021, due to compliance with appropriate governmental orders as set forth herein, South Delta's efforts to obtain, administer, perform and be compensated for services that were the subjects of existing or prospective grants was impeded and limited to such an extent as to cause a partial suspension of the operation of South Delta.

220. At various times throughout 2020 and during the three tax quarters of 2021, South Delta experienced occurrences of clients and/or employees being either ill with COVID or having been exposed to COVID and those persons being in or on the premises of South Delta property. As a consequence of these events and because of the governmental orders, South Delta sought the benefit of the Premises Liability Immunity statute to obtain protection against civil immunity for death and personal injury related to COVID virus by making a good faith effort to follow applicable public health guidance.

**CAUSES OF ACTION**
**Refund Claim**

221. South Delta incorporates by reference the allegations in Paragraphs 1 to 217 as if fully set forth herein.

222. Pursuant to I.R.C. § 7422, a taxpayer may file a civil action against the United States for the recovery of taxes after a claim for refund has been filed with the Secretary.

223. Pursuant to I.R.C. § 6532, no suit for refund shall begin (a) prior to the expiration of six months from the date of filing the claim for refund, or (b) after the expiration of two years from the date the Secretary notifies the taxpayer that its claim has been disallowed.

224. South Delta satisfies each of these requirements.

225. South Delta qualified for the ERC for 2020 and 2021 under the suspension test and meets the criteria to receive ERC for Q2 and Q3 of 2020 and Q1, Q2, and Q3 of 2021.

42

226. The IRS originally paid South Delta's claims for Q2 and Q3 2020 and Q1 and Q2 of 2021, but then erroneously disallowed them as it asserted South Delta was a governmental entity.

227. South Delta is not a governmental entity.

228. The IRS has never addressed South Delta's Q3-2021 claim.

229. South Delta is entitled to a tax refund for all requested quarters under the suspension test of the CARES Act, as amended.

230. Additionally, and/or alternatively, South Delta is entitled to an order stating that it may keep the quarters previously paid by the IRS, without penalty, and that it is entitled to a tax refund for Q3-2021.

231. South Delta is an eligible employer under the CARES Act criteria because it "was carrying on a trade or business" during those quarters and its business operations during each quarter were "fully or partially suspended" "due to orders from an appropriate governmental authority . . . ." 26 U.S.C. § 3134(c)(2)(A).

232. Because South Delta employed "not greater than 500 employees," its qualified wages are those "wages paid by such eligible employer with respect to an employee during any period" during which the business was fully or partially suspended. 26 U.S.C. § 3134(c)(3)(A)(ii)(I).

233. South Delta is entitled to the full amount of ERC claimed (or as allowed by law), together with interest pursuant to I.R.C. § 6611, as well as reasonable attorney fees and legal costs associated with this cause of action, pursuant to 28 U.S.C § 2412 and/or I.R.C. § 7430.

234. South Delta made timely and proper ERC claims with the IRS. South Delta timely filed and paid employment taxes for the quarters at issue, sending Forms 941 and the amounts owed for those taxes.

235. South Delta filed its Forms 941-X for Q2-2020, Q3-2020, Q1-2021, Q2-2021, and Q3-2021 on or about February 9, 2023. As reported in Forms 941-X, South Delta's qualified wages were:

    a. Q2 2020: $128,475.68

    b. Q3 2020: $2,394.65

    c. Q1 2021: $410,903.12

    d. Q2 2021: $419,930.88

    e. Q3 2021: $411,138.38

236. South Delta claimed ERCs for those quarters of:

    a. Q2 2020: $253,284.09

    b. Q3 2020: $11,715.91

    c. Q1 2021: $371,000.00

    d. Q2 2021: $376,625.47

    e. Q3 2021: $371,396.00

237. Under I.R.C. § 6611, the United States owes interest on the refund due to South Delta "from the date of the overpayment to a date (to be determined by the Secretary) preceding the date of the refund check by not more than 30 days." I.R.C. § 6611(b)(2).

238. South Delta overpaid its taxes and is entitled to the corresponding interest on its overpayment.

**Attorney Fees and Administrative Costs Claim**

239. South Delta repeats, realleges, and incorporates by reference, herein all preceding paragraphs as though fully set forth herein.

240. In addition to its refund and statutory interest, South Delta is also entitled to its administrative costs, including attorneys' fees.

241. The Defendant must pay reasonable litigation and administrative costs to a prevailing party unless its position in the proceeding was "substantially justified." I.R.C. § 7430(c)(4)(B).

242. Here, the Defendant's position was not substantially justified.

243. In disallowing South Delta's Q2-2020, Q3-2020, Q1-2021, and Q2-2021 claims and failing to pay South Delta's Q3-2021 ERC claims, all of which were objectively due based upon the partial suspension of South Delta's operations as provided for in the clear language under I.R.C. § 3134 *and* Notice 2021-20, the IRS's position was not substantially justified.

244. South Delta's entitlement to the ERCs at issue is straightforward. The IRS's disallowing of the money it previously paid for Q2-2020, Q3-2020, Q1-2021, and Q2-2021 for the reasons that it gave was not substantially justified.

245. The IRS's failure to promptly pay the Q3-2021 ERC refund, now past due, is also not substantially justified.

### JURY TRIAL DEMAND

246. South Delta demands a jury trial on all issues so triable.

### PRAYER FOR RELIEF

Wherefore, South Delta respectfully requests that this Court enter a judgment against Defendant, the United States of America, for:

(A) A tax refund for Q2 2020 representing ERC in the amount of $253,284.09, or such amount as may be properly due along with statutory interest thereupon,

45

(B)     A tax refund for Q3 2020 representing ERC in the amount of $11,715.91, or such amount as may be properly due along with statutory interest thereupon;

(C)     A tax refund for Q1 2021 representing ERC in the amount of $371,000.00, or such amount as may be properly due along with statutory interest thereupon;

(D)     A tax refund for Q2 2021 representing ERC in the amount of $376,625.47, or such amount as may be properly due along with statutory interest thereupon;

(E)     A tax refund for Q3 2021 representing ERC in the amount of $371,396.00, or such amount as may be properly due along with statutory interest thereupon;

(F)     Additionally, and alternatively, a judgment that South Delta is entitled to keep the money the IRS previously paid it on Q2 2020 and Q3 2020 and Q1 2021, and Q2 2021;

(G)     Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law; and

(D)     All other relief as this Court deems necessary.

Respectfully submitted, this the 5th day of December, 2025.

/s/ *Bethany A. Tarpley*
JAMIE F. LEE            (MSB # 101881)
MATTHEW ANDREWS         (MSB # 103151)
KEITH B. FRANKLIN       (MSB # 105376)
BETHANY A. TARPLEY      (MSB # 104134)
*Attorneys for SOUTH DELTA PLANNING &*
*DEVELOPMENT DISTRICT*

**OF COUNSEL:**

**E.J. SAAD LAW FIRM**
6207 Cottage Hill Road, Ste. G
Mobile, AL 36609
Phone: (251) 660-0888
jamielee@ejsaadlaw.com
mandrews@ejsaadlaw.com
k.franklin@ejsaadlaw.com
batarpley@ejsaadlaw.com